The estate of Danny French. This is a complicated case. There are several issues. As the court is aware, this case has been going on already for 15 years. It might go on for another 15. But with regard to why we're here today, this is an appeal of commission decision wherein the commission found that my client, Mr. French, was no longer permanently disabled. With regard to the decision, I would have to say that I have never seen a commission decision that attacks the petitioner's attorney in such a way as this one does to me. And then it's also clear that Commissioner Buskett had some sort of bias toward me or my client for some reason, because throughout the decision, which the actual discussion is maybe four pages, there's footnote and annotation to myself, which I highlighted here in pink. And then one of the first of the issues is that because I was made a part of the case, and this case could argue a little more about me than it ever was about Mr. French, that then I was afforded an opportunity as a witness at the trial. In this particular case, Commissioner Buskett refers to me as someone who has been charged with perjury, but not given an opportunity to explain those charges, which subsequently were dismissed by a special prosecutor. The charges that initially were brought against me, that State's attorney has now been indicted himself on 17 felonies. Well, that being too far afield, what does this have to do with the commission's decision? It goes to the commission's decision because they ignored everything that I was saying and looked at everything suspect. Well, how do we know that? Well, I think for me it's clear in the decision when a commissioner takes personal attacks at someone rather than focusing on the actual evidence at hand. I would be in a good position that if we're talking about someone's disability, whether they are able to work, this is a case about Dan French's back. And Dan French is undisputed that he did have a work-related injury. The commission's decision did say that. But this is a case about Dan French's back. The screws that were in his back, these screws that were at L5-S1, which I have for the court to see, these screws that subsequently caused further damage at the level of his knee for surgery. And we have a decision that is not based on any objective test or findings. The question is, can Mr. French work an average, normal 36 to 40-hour week work, 40-hour work, 40-hour work week? And the question is no. Here's what we have. Commissioner Luskin says that the petitioner's witnesses, Mr. Luskin, Mrs. Craig, and Mr. Borostowsky, who are relatives of Mr. French's, are not credited because they have some financial interest. But every witness for the respondent had more of a financial interest. Every one of their witnesses were paid, retained experts. And so he says, well, we're not going to believe that they're witnesses because they have something possibly to gain by it. But we're going to listen to the respondent's experts even though they're paid thousands and thousands of dollars. But in this case, the only objective evidence that we have is MRIs. Wait a second. What about these surveillance videos that were emitted which they show the claimant walking without difficulty? He's in an arm wrestling match. He's hoisting himself over the edge of a boat. He's walking around in and out of the casino without being in a wheelchair. He's riding, driving an SUV, riding a bicycle or a moped, bending to wipe something off a bumper of a car, removing a seat from a jet ski. That's not any objective evidence there? No, because those surveillance tapes, as I argued at the commission and then subsequently at the trial, at the circuit court, which the judge agreed, were contemporaneously edited. In this particular case... Does that affect the admissibility or the weight to be given? I think they would absolutely affect the admissibility because to be admissible is a question of law. And for them to be admissible, they have to be very accurate and they have to depict what's actually going on. I have photographs of me on the Eiffel Tower. I've never been to France. It was taken in Las Vegas. So am I going to produce these... So are you saying these videotapes, the decedent was not in the videotapes at all? He was. He was not in arm wrestling? That's not true? They're highly edited. The arm wrestling surveillance is not surveillance video. Well, is that not him? It is him. But that particular video, which is 20 seconds long, which supposedly was authenticated by Mr. King, who has credibility issues himself... Well, forget about Mr. King's credibility. You're admitting it was the decedent. Is that the... It was. Okay, so does that depict somebody who's bedridden and can hardly move? It does. In an arm wrestling contest, really? For 20 seconds, there's no argument that he's going to be a professional arm wrestler. This was taken during a break at a poker game, which Mr. King actually testified that at these games, Mr. French would have a special chair. Other people would deal for him because of his back issues. That there were incidents when he left the card game and he told them that he was having back pain. When Mr. King was asked, did Mr. French ever complain of back pain to you, he said he always complained of back pain. So just because someone has back pain and limited mobility doesn't mean that they can't do certain things. The issue is, can he go and be gainfully employed? Because you can arm wrestle under the influence of narcotics and marijuana. You can cut your grass, although there's no evidence that he cut the grass. You can do all kinds of things when you're under the influence of heavy narcotics and medical cannabis. But you cannot be employed while taking those types of medications. Because they do affect your ability to concentrate, your motor skills. And no employer that I know of would ever hire anyone, contrary to the respondents' expert. Who when asked, well, their vocation expert, well, you've never met Mr. French. You're based on your opinions on a 20-year-old resume. And given the medications that he takes, including medical cannabis, can he work somewhere? Well, sure, there's employers that hire you if you're under the influence. Who? I've never heard of one. And he couldn't provide one either. So the respondent on an ADAPT petition has a burden of proof to show either, one, that Mr. French returned to work. Or two, that he was capable of returning to work at the same rate of pay. Now, there is absolutely no evidence that he returned to work. There was some allegation that he did some internet car sales. But there's no evidence of that. When he asked Mr. King, your best friend with Mr. French, name one thing that he ever sold on the internet. I don't recall. Where are the tax returns showing the supposed income? Where are the internet sales receipts? And if you're a car dealer, you would need a special license from the state of Illinois. And to make that allegation that, well, Mr. French has to be working somewhere. Because he has this house and he has access to the cars, in my opinion, is pretty sexist. Given the fact that Mr. French's partner of 27 years or 24 years, myself, is a successful plaintiff's attorney. If the roles were reversed and I was the injured party and Mr. French was the attorney, would anyone say that because I was driving an Escalade that I must be working somewhere? Or would the assumption be that Mr. French, as an attorney, could provide sufficient income to supply a house and vehicles? And with regard to these vehicles, they say, well, he owns these vehicles. He didn't own any of these vehicles. He's been dead for a year. And guess what? I still have an Escalade. I still have a CTS. And I still have two Porsches because they were mine to begin with. I paid for them. And he never provided any payment for them. But, again, it's another assumption by Commissioner Luskin. And, again, it's not relevant. Except for the point of, if you're saying that Mr. French, who's under video surveillance for three months in the summertime, who is so able-bodied, okay, that after three months you can just provide snippets of video surveillance here, snippets of video surveillance here, and snippets here. When I asked for all of the video surveillance, it wasn't provided to me. And subsequent litigation, when it was subpoenaed, it wasn't provided to me. Because when you're talking about video surveillance and you're surveilling someone, you want the entire scene. You want to know exactly what's going on. And in this particular situation, other video that would come in would have just as much relevance, even if it didn't show Mr. French. Because if the argument is that Mr. French can work and that he can arm wrestle, he can lift things, and he's not bedridden, well, if the video shows myself or others cutting grass, carrying in groceries, carrying in dog food, doing all the maintenance around the house, wouldn't that tend to show, or at least give you the inclination as to, well, if this able-bodied, 40-year-old woman, 40-year-old man isn't doing anything, why is this woman doing everything? Let's switch away from the video evidence. Who's Dr. Singh? Dr. Singh was a psychiatrist. He's not an independent medical? He didn't perform? Oh, Dr. Singh, yes. I apologize. I thought you were talking about Dr. Singh. According to records, in August 2014, Dr. Singh performed an independent medical record review and opined that the decedent could return to work without restrictions. Is that true? That is true, but Dr. Singh did not have the medical records. And then we'll get back to the commission's decision, where they arbitrarily pick a February 2014 video of an arm wrestling incident. And they say, based on this 20-second snippet... Is this Dr. Singh you're talking about now? Dr. Singh's report is based on the medical records up to that point, but it did not include the MRI. I don't recall it. Okay, who's Dr. Mather? Dr. Mather was the IME that he saw in, I believe, the following year, Dr. Singh. He performed an IME of the claim that he concluded that decedent had, quote-unquote, some capability for employability. Is that correct? He did. So doesn't that count as evidence? No. Dr. Mather's report is flawed in the fact that he mentions that Mr. French can do these things, that he conducted an examination of Mr. French. Mr. French's examination occurred at the commission, in a commission room. So how do you perform a medical examination by putting someone... Well, why was it in the commission room? Because Dr. French... Because he was swearing and screaming in Dr. Mather's reception area when he went to his office? That's the allegation by Dr. Mather. But again, I was there... Was he lying? No. Dr. Mather? Yes. Why would he lie? Dr. Mather was not there. Why would the doctor... Now, everybody in the world is against the decedent. Why would the doctor lie about that? The doctor wasn't present for that conversation. And the doctor would lie because he's getting paid thousands of dollars by the respondent to pay the IME. Who's Daniel Minich? He is a vocational rehabilitation expert. But did he say that his assessment was that French could pursue occupations at the medium level and earn wages commensurate with his previous wages? Did he write that in his report? He did. What's wrong with his report? Without ever seeing Mr. French, based solely on a 20-year-old resume, and then also not taking into consideration any of Mr. French's medical needs or the fact of the medications that he takes. Because when I asked Mr. Minich about the medications he took, he was unaware that he took the medications that he took. It's one thing to be able to do things, but you're constantly under the influence, which even the commissioner in his decision says, he's always under the influence. You have to ask leading questions. He's not a credible witness, not because what he's saying isn't the truth. It's because he's under the influence. And in this particular case, those are the problems that we have. So here's what we have. We have a commission decision that says in February 2014, based on this arm wrestling incident, he can go back to work doing some job. What job? There's no evidences to this job. How much he will make. So the whole decision was based on the video, the other witnesses, singing mad, they're reporting to you. Everybody is either wrong or mistaken. Correct. Or a lot of the commission decision is based on assumptions. Well, they cited specific witnesses and specific evidence. There's no assumption there when they cite two doctors' testimony and records, is there? Yes, because the assumption is that Dr. Mathers says, well, Mr. French told me that this, and Mr. French gave me this history, but it's not in Dr. Mathers' report, it is that I have to be called back at the IME to give history and fill in the blanks and provide additional information. So, and additionally, when the commission says, well, yes, we have this board-certified surgeon, Dr. McNally, who says that Mr. French needs another surgery, that he is disabled regardless of the outcome of the surgery. But in that case, that's not credible, given the history that Mr. French gives to Dr. McNally. Well, let's cut to the very specific point in question. I mean, you've articulated, you've done a good job of saying, well, all these people are not credible, okay? Yes. But who makes a credibility finding in a workers' compensation case? Do you know? The commissioner does. But the issue is, the most credible witness that could have been called at hearing would have been myself. Well, let's assume that's true. Yes. Okay? But we don't assess credibility. We don't substitute our judgment for the commission's on credibility issues, do we? No. And the issue is that you take out the witnesses and the credibility of the witnesses and you look at the actual evidence. Here you have a decision in February of 2014 saying, or a decision saying that in February of 2014, he can return to work based on his congressman video, okay? That video, however, predates medical reference evidencing that Mr. French had numerous falls in March, April, May, had injections in January, in July. Of what year? Of 2014. Then what about the video footage of Jumer's Casino in May 15th, 16th of 2015? In that video, there's subsequent video. That trip was four days. The first day, which was a Thursday, Mr. French was using a wheelchair. On the last day, that was a Sunday, Mr. French was using a wheelchair. In between, he was not. When you have a back injury, if some days you're feeling better than others, depending on activity and what you do, if we look at the surveillance and the active surveillance of Mr. French, which was at the September, end of August, early September of 2015, in that they have a video of him outside his home. This is a gentleman who supposedly has all these fancy cars and can just live the life of leisure, doing whatever he wants. But you don't see him for days on end, not even not doing anything. You don't even see him in perfect summer weather exiting his home for one minute. What is he doing? There are minutes that he's inside and he's back ready. And so at certain points in time, he is laying in bed, he can't move, he's immobile. And then other times, you feel better. It's a situation which is clear in the surveillance, is that when he's at the river with his boat in this debacle there, then you don't see him for several more days, presumably, and according to his testimony, because he's in bed recovering from that. So it's not a situation that he can't do anything. And then at times, he is bed ready. But at other times, he is able to do more activities. And the decision, like I was saying, is based on a video surveillance that predates an increase in the disability, which predates the MRI which showed complete nerve compression at 4 or 5. It predates Dr. McNally saying that he's in need of surgery. And the expert that the respondent uses, two of the three have never met Mr. French. It's a reference review. It's a review of a resume that's 20 years old. And the evidence is that you have a 40-year-old man who never graduated high school, who doesn't have a GED, who doesn't read. Although, again, Commissioner Luskin doesn't believe that. But if you look at the e-mails that were written, and even though I stipulated that I wrote e-mails, you don't have a layperson, especially Mr. French, talking about Medicare set-aside, subrogation leaves, common-clinic doctor until we're talking about prescriptions and reimbursement for prescriptions. So it's clear from the language that those were written by me. But everything that was presented, Commissioner Luskin found fault with, but was never afforded an opportunity to correct it. For example, he says, well, the evidence is that Mr. French doesn't drive. But he says he drove to Canton. Well, he didn't drive to Canton. I drove to Canton. He was in the car. It would be similar as if I said, yeah, I took a new roof on the house last summer. Does it mean I physically got up there and put a roof on my house? No, but I hired somebody to do it. So what I have to say to the manager that I did it. And that's the situation that we're in. And in this particular case, we started this trial with a petition for medical expenses. And at that point in time, a respondent knew that I would be testifying as a witness. I testified at the previous trials. And instead of raising this issue of disqualifying me as an attorney, they tried to disqualify me as a witness. At that particular time, in regards to the petitioner's petition, it wasn't necessary because I'm proceeding under the assumption that we're going to base our decision based upon medical evidence, tangible, objective findings, MRI reports, board-certified neurosurgeons and orthopedic surgeons' opinions. And so at that point in time, Mr. French chose to proceed without me being a witness. Then, for the second half of this trial, you have a respondent come in with hours of video. And in every video, there is me. But now I'm not going to be able to testify as a law witness. Perhaps they should have disclosed the fact that their entire case was going to rest on surveillance video and that plaintiff petitioner's attorney was going to be in it. And with regard to those videos, they were absolutely edited. And that's what the circuit court found. They didn't find that it was an abuse of discretion. My position is that it would be a de novo standard because they don't fairly and accurately depict. That surveillance at the river, that tape cuts off 9, 11 times in a 45-minute period. And according to Mr. Milk, who provided the surveillance, he said that from where he was standing, he could have got a shot of everything and got a clear picture of everything. But he chose to zoom in and out on Mr. French. And, again, I'm in the videos, but I'm not allowed to testify. They say, well, Mr. French is doing this, Mr. French is doing that. Yes, but what is Ms. Eichster doing? She's paddling the boat back. She's trying to load the boat up. But, see, again, I'm propped out of that video surveillance, which isn't a fairly accurate depiction. If we had video of someone playing a tennis match and we zoom in just on one player, how do we know they're actually playing somebody? Maybe they're just having an automatic surveillance. Well, that goes to the weight of the evidence, doesn't it? I mean, that's for the commission to decide. You make those arguments that it's not entitled to a lot of weight, and that's up to them to decide, right? It does go to weight, but you're also talking about presenting evidence and not allowing rebuttal evidence. Well, couldn't the claimant to see it and have testified? No. Why? Because he's under the influence of narcotics. He was a terrible witness. Nobody disputes that. There was evidence presented at hearing that he had a criminal case, and they didn't think he was fit to stand trial because he was always high as a kite. It's not a negative thing on him. That was part of his life that he had to take prescription medication, so therefore he was a bad witness. That's why for 15 years he never went to a doctor's appointment by himself. He never provided a medical history to any doctor. So when the commission says, well, we're basing this on Dr. McNally's report, which is based on history provided to them by Mr. French, again, that's an assumption that's incorrect because Mr. French never provided that. I did. And, again, with regard to excluding me as a witness, I believe that violates the due process in the 14th Amendment because only the respondent was allowed to present evidence as to Mr. French's disability. Isn't there a rule of professional conduct? Isn't there a witness-advocate rule that generally bars an attorney from being both a witness and an attorney in the same case? Isn't there such a rule? There is a rule. It's Rule 3.7, and it does not bar. And that was the problem that I had with it. So it's common that there's no restrictions on an attorney being a witness and representing the party in the same case. Is that what you're telling me? It says that a lawyer cannot be a witness unless they're testifying to an uncontracted, you know, to attorney's fees, something that's not in dispute, or if their disqualification would create a substantial hardship to the client. So now you're telling me that you admit now that there is such a rule but there's exceptions. There is a rule. Okay. Thank you. But Mr. Luskin misunderstood and misapplied the law. There's Rules 1.7 and 1.8 that deal with conflict of interest. He was saying you can't testify against a conflict of interest. It's not a conflict of interest. It's 3.7, which is a rule. And we never got to that. And that's why I kept repeatedly asking him. And in this particular case, Mr. French and I have been together for 20 years. I represented him on numerous cases wherein I had motions to disqualify because the proper approach and the proper procedure is not to bar an attorney from being a witness because there's no evidence of witnesses being barred except for discovery or procedural sanctions. In this particular case, if the respondent was going to object and it was their position to object, they would do it with a motion to disqualify me, not bar me as a witness. And that's the problem that we have is that Commissioner Luskin barred me on a second, on a respondent's petition under AF. He barred me from being the witness rather than disqualifying me as the attorney, if he believed. Now, specifically, Rule 3.7. I've let you go way over time here. You'll have time in reply. Thank you. Counsel, you may respond. May it please the Court, Your Honors. My name is Matthew Berkusik, and I'm here on behalf of the respondent of L.E., Walmart Stores, and Sam's Club. I'm here today to respond to the petitioner's argument in support of the Commission's decision on this matter. And in so doing, I would, on behalf, like to ask the Court to do three things. First and foremost, I'd like to ask this Court to apply to the Supreme Court rules and find that the petitioner agrees an argument wholly failed to comply with the rules 3.1H.6 and 3.1H.7 as the petitioner fails to provide an expert statement of facts and fails to make her verb of informing this Court to evolve complications providing case law in support of her claim and providing all the necessary references to the record. Now, I understand that enforcing those rules is discretionary. I will address why the petitioner's actions in this case are so negligent and over-required enforcement as part of my address argument on the other issues. These other issues are twofold. One, we have the petitioner's argument with regards to due process and evidentiary issues. The second, we have the manifest way argument with regards to certain elements of the Commission's decision. So first, we've got to take a look at this. Before we go any further, I'd like to address the question of due process. Petitioner had the opportunity to present evidence in support of her case. In fact, she had the entire day of February 18th of 2016 to present evidence in support of her case. Petitioner had the opportunity to cross-examine and respond to witnesses. This was done on February 19th of 2016. Petitioner had the opportunity to be recalled and presented with Bible testimony. In fact, I've introduced additional witnesses and evidentiary evidence on March 14th of 2016. Petitioner is so plain that there is a due process violation. It's because petitioner was not allowed to call every witness he wanted. In particular, Ms. Heisler, his attorney. And under the advocate-witness rule, this is an evidentiary issue. This is not a due process argument subject to the standard of a mistake law. The courts have been very clear in applying the advocate-witness rule that it worked for the attorney to testify. There must be a showing that the attorney's testimony is necessary. The attorney must be a necessary witness. In this case, petitioner only failed to prove that she was a necessary witness. There is not a single argument in her brief or citation to establish that her testimony was necessary.  As I was reading the record in briefs, given at some point when this issue came up, was counsel ever given the opportunity to obtain a substitute counsel for the prior case? I'm sorry, Your Honor. Was there an opportunity to substitute counsel? I'm sorry? Was there an opportunity to substitute counsel? Yes. And what happened with that? The petitioner was given a recess in order to discuss the matter with his attorney. After discussing the matter, the petitioner came back to the court and elected to proceed with the hearing, knowing that that would bar Ms. Eichner from testifying. Commissioner Luskin offered him the opportunity to leave, to stop the hearing, early on on February 18th and introduce new evidence. But here, petitioner failed to present any evidence of the substantial hardship in finding a new attorney. And, in fact, the commission in its decision noted that the petitioner had that opportunity again. When we came back three weeks later, She's arguing that she had to be a witness because she was in the video. I'm sorry? She was arguing that she was a necessary witness because she had to be in the video. What's your response to that? So it was a petitioner, and the petitioner was there to testify about the video. The petitioner's attorney is not the only one who could have testified about that. She's saying he was under the influence of some medications or something. Do you have anything about that? There is ample evidence in the record that the petitioner did not require all of the medication that he was taking. That he chose to take medication at this hearing, prior to this hearing, was something that he may or may not have necessarily needed to do. If he felt he was unable to testify, certainly the petitioner could have been within the right to seek a continuance of the matter. It is important to note, at the time of this hearing, the petitioner was already filed permanently totally disabled. He was receiving benefits from the respondent in the form of a permanent total disability award. We could not suspend those benefits subject to that award. So there was no reason why he couldn't have seen a lot of continuance to another day. He would have continued to have been taken. This is a lot different than your typical worker's complimentation. Or the continuance would have been based on what, from your perspective? I'm sorry? The continuance that would be based on what? An inability to proceed and participate in his own property. Certainly, a petitioner has a right to participate. If he could not appear to do so, it would have been proper to seek a continuance. Now, as we go back, the case law, specifically the decision in Bauer v. Memorial Hospital and Warden Marine, even in the legal case cited by the petitioner's attorney, which was an unpublished decision, also had to discuss this issue of attorney's adequate witness. But you're not citing to us an unpublished decision, are you? I am not, no. It was cited in the petitioner's attorney's brief. It is something that is barred by the rule. And just another example of the fact that... Let's try to focus it on the issues in the evidence rather than the brief, okay? Fair enough. With regards to the adequate witness rule, when an attorney has been allowed to testify in limited circumstances, the instances have looked at narrowly tabled issues and whether or not the attorney is providing specific testimony. In this case, the petitioner failed to make any offer of proof. However, the record does reply what the petitioner intended to testify to in this hearing. If you refer to page 436 of the record, when asked during the initial discussion with regards to her testimony, Ms. Heister stated that she would bounce off of what Mr. French had already testified to just with more clarity. She's not offering new testimony. She's not offering something that Mr. French couldn't offer. She is just restating the testimony he has already given as she sees fit. The same question was addressed at the time of the bubble ban on March 14th of 2016. At the time, the petitioner's attorney indicated that she would provide testimony leading up to the events of the surveillance case. The surveillance tapes are relevant because it shows the petitioner's activities. The petitioner, being in the surveillance tape, is obviously the best person to testify about his own activities on or before that date. Here, the petitioner has presented no evidence that she is a necessary witness. Therefore, the court should not find that the commission abuses that discussion in finding that she is not permitted to testify pursuant to the attorney-witness rule. Now, moving on, we have the issue of the surveillance tapes. And while I respect the issue of not addressing the briefings of the court rulings, this is another instance where the petitioner failed to explain what's going on here to the court. The petitioner's attorney got up here today and argued that the surveillance from Delta Investigation should be thrown out. Delta Investigation, there were three different types of surveillance. There were three different activities introduced at trial from Delta Investigation as far as video surveillance. Respondents did it 29 and 31. Well, actually, she had an explanation for the videos. In general, her explanation was somebody who has serious injuries, is under medication, they have good days and bad days is sort of the argument. How do you respond to that? That that was not really illustrative of his general condition. That goes to the weight given to the evidence, and it's properly considered under the manifest weight of the standard, and it's something for the commission to consider. What I'm trying to address at the moment is the evidentiary issue of whether or not those exhibits should be introduced. Now, the stationary surveillance video in particular was introduced without objection by stipulation of the parties. Petitioner cannot sit idly by and allow evidence to be introduced without making an objection, and then later come on and argue that the evidence should be excluded. So as far as court exhibits, Respondents did it 29 and 31, the stationary surveillance videos from Delta Investigation. Petitioner missed the opportunity to object to those videos. The commission denied his discretion. We then have the live surveillance video obtained by Mr. obtained by, from Delta Investigation, in which case the petitioner had the opportunity to cross-examine the individual who took that video. There's an argument that the video was added, edited, because the camera was turned off, but there's no evidence that anything was improperly excluded. She provides an argument today saying that the, that somehow the video is in that, because it zoomed in on the petitioner, who is, of course, the subject to this entire hearing, and didn't show her activities. Well, sure. I can, you know, I went to Wrigley Field last night. I can watch a baseball game, and I can watch the entire ballpark. You didn't see a game last night at Wrigley Field, did you? I'm sorry? Did you see a game last night at Wrigley Field? I saw a pirate's game on Jumbotron. Okay, because I was going to say, if you're telling us that you saw a game, you could have some credibility problems. That would be absolutely true. But what we saw in that pirate's game was... And I was watching a television. I didn't see a game last night. Well, I use it as an analogy situation on this case. Okay. In a baseball game, you're watching the pitcher and the hitter. You don't really care what the left fielder is doing while the batter is throwing a pitch. And this is, that is the case here. Moving on, Your Honor, the last thing I'd like to address is the factual findings of the commission, which are subject to the manifest ways of the evidence standard and should only be overturned by this Court if the opposite conclusion is clearly apparent and no rational timefract could have found in favor of... You don't have to get into the rational end with the opposite conclusion. Thank you. Okay. In this particular case, the petitioner relies on the opinion of Dr. McDally, who, contrary to all her arguments, does not recommend surgery. Dr. McDally saw the petitioner on one occasion. At that time, he set out a plan to evaluate the petitioner's considered condition and discern whether or not he needed surgery. This was identified by the commission and the circuit court, if you would refer to the report preceded before the whole circuit court argument. Dr. McDally certainly considers the petitioner a possible candidate for surgery, but he wanted the petitioner to try a medical record. He wanted new EMG studies to see whether the petitioner was a surgical candidate. In contrast, we have opinions from Dr. Stephen Mallard. We have opinions from Dr. Karan Singh, both of whom have found that the petitioner does not require surgery based on the objective findings in the medical record and the diagnosis. He doesn't explain. It was well within the commission's right to waive the report of the independent medical examiner against the report of Dr. McDally. Furthermore, we have a question with regards to the other evidence considered by the commission. It would be impossible to ignore the view of the petitioner behaving inconsistent in the nature of how he presents himself in the court. An article was introduced about the petitioner's presentation at the trial by his criminal proceeding in which he came to court and was wrapped up with his hands and being fed juice by a syphilc cup. Two days later, he's in Juneau's Casino walking around without care in the world. The commission probably waived this to determine which doctors were credible. They found Dr. Mallard credible. They found Dr. Singh to be credible, and that was within their rights. So the question now becomes whether or not the respondent met its verbal proof to establish that the petitioner is no longer permanently totally disabled under Section 8F, because that is our verbal proof. Section 8F finds that a warrant of her mental disability benefits can be terminated if the petitioner has returned to work or is able to return to work and has or either is able to earn wages. In this case, we have opinions from medical physicians finding that the petitioner is able to return to work with restrictions. We have opinions from a vocational counselor who took a look at his prior employment history, who ran a transferable skills analysis using government day-to-day tools, who conducted a labor market survey looking at the area in the job market into the petitioner's home area and found that he was capable of maintaining employment in the open labor market. The petitioner offered nothing but his own testimony and the testimony of lay witnesses to refute these claims. The commission was justified in finding that the respondent had met its verbal proof and was entitled to terminate her mental disability benefits. Thank you. I see my time is up. Yes. Thank you. Thank you, Counsel. Counsel, you have five minutes to reply. With regard to the respondent's argument with regard to the brief, I agree and I do apologize to the court with regard to my brief and it being lacking. However, this brief has been done several months after losing Mr. French and I did the best I could at the time. So I apologize for that. With regard to respondent's argument as far as that I have to be a necessary witness, he's confusing these rules. And this is why I repeatedly asked Commissioner Busk to refute the issue because I have briefed with the lawyers on this issue on half the designations in the circuit court for our law firm in Illinois. Well, specifically, the Sallie Perrell comes with Mr. French. I'm familiar with it. I kept asking to brief him. Under Rule 3.7, when you're asking for a lawyer to be disqualified, the person asking for the disqualification, which is usually the opposing side, has to prove that the attorney is going to be a necessary witness. Otherwise, it would be abused as a tool because if defense counsel didn't like plaintiff's counsel, they'd just say, hey, we're going to call him as a witness and disqualify him and get somebody else in here. But so the attorney asking for the disqualification has to prove that the person, that the attorney is a necessary witness. It doesn't have to prove that I'm a necessary witness if I'm going to testify on behalf of my client. It has to prove that I was a necessary witness if they were going to call me on behalf of a respondent. So it's a little bit of confusion there. As far as Rule 3.7, again, it's a disqualification of the attorney not borrowing the witness. Your Honor, I asked counsel about whether or not petitioners afford an opportunity to seek other counsel. Let's back up. Mr. French's prior attorneys who had this case for a decade withdrew in early 2014. I believe it was somewhere around May. Mr. French was pro se for several months. That pro se did not end well and actually resulted in respondent's attorney at the time betraying them. They had no contact order against the petitioner. So Mr. French wanted to be pro se. Well, he didn't want to be pro se. Who got the no contact order? Mr. Betraying did. He was representing Mr. French? Yes. So you have a pro se. Wasn't Betraying representing Walmart? Yes. He was representing Walmart. Mr. Betraying was representing Walmart. Mr. French in the summer of 2014 was representing himself. And then you were trying to get a no contact order, which makes it difficult for petitioner and respondent to communicate when legally Mr. French would be far from doing so. That was the result of, as counsel pointed out, Mr. French went to Dr. McNally and Dr. McNally didn't recommend surgery. That's not necessarily correct. Dr. McNally said, these are your surgical options. You need additional testing. Mr. French needed approval for additional testing from the respondent. After repeated calls to Mr. Betraying and him not responding, Mr. French then left some very colorful voicemails for Mr. Betraying. So to speak. So to speak. Which then ultimately led to the no contact order. So now in August of 2014, Mr. French is scheduled to see Dr. Singh. Which, by the way, there's evidence that that meeting was scheduled because Mr. French wanted to seek treatment at Rush. And Mr. French couldn't get to Rush. Mr. Betraying had talked to them before the falling out and said, I'll schedule an IME. You go to the IME. If all's well, you can continue to treat at Rush with Dr. Singh. But then after they had her falling out, and I believe it was July, then all of a sudden the IME switches to a records review. Now according to the respondent, that's because Dr. Singh didn't feel comfortable dealing with Mr. French. However, again, since I'm not a witness, I talked to Dr. Singh's office about rescheduling the IME and they made no mention of any issues that they had with Mr. French. They said that Mr. Betraying had decided now to just have a records review rather than an actual examination. According to Mr. French, he believes that Mr. Betraying did that just so Mr. French would be barred from treating at Rush. Because now Rush would not even see him as a regular patient because he had already had this records review. So to say that Mr. French could get out of counsel, if that were absolutely possible, I would never have entered my appearance. I don't handle workers' count cases. I don't like workers' count cases. And this is probably one of maybe four or five that I've ever handled. And it's the most complicated case in probably commission history. But as we're sitting here in August and September of 2014, Mr. French is in need of medical treatment. Respondent's attorney has an order of protection against him. Nothing's getting done. And so I enter my appearance to get things moving along. When we're sitting at trial two years later, a year and a half later, and counsel says, well, Mr. French has a four-year opportunity to seek out a counsel. No, he wasn't. The first petition was his petition for surgery and an assistant in medical cannabis. That had been proven by the medical records. When respondent, at that point in time, if they would have been honest and said, your Honor, as part of our petition, we're going to bring tons of surveillance video, and Ms. Eichner's going to be in it, do you think that would have had any bearing on Mr. French's decision whether or not to proceed with me now being a witness? Of course it would. So when we revisit the issue and I say, okay, now I absolutely have to testify as a rebuttal witness because they brought in evidence of me. They made me part of this case. Then they say, no, you can't be a witness still. That he was never afforded an opportunity, as after the respondent's case in their petition, to get additional counsel. And as a matter of fact, it's never possible. Now, again, I wasn't allowed to testify, but I argued, I believe, in front of Commissioner Luskin, that if it were possible to get Mr. French subsequent counsel, I would have done it. But nobody's going to take a 12-year-old case with a nightmare client, and that's Mr. French's terms as to how he is. I'm your nightmare client. Nobody's going to take that if you're not getting paid because he's a total perv. There's nothing else to be had. He's a nightmare client. And the case is older than, you know, than an oak tree. So in this particular case, he wasn't afforded that opportunity to substitute counsel. And then as far as the IME reports and the video surveillance, while Mr. French did testify, Mr. French didn't know what plan he was on. He actually said that. He testified on day one, he was there. On day two, he didn't come back because he was tired and he didn't want to sit there for another day. He was at home in bed. On day three, he shows up again, which was in March, and he says, you know, when I was here before, I didn't know what I was talking about. But yet that's who I'm going to put on as a rebuttal witness to rebut all this evidence of video surveillance from a year or a year and a half prior, the guy who doesn't remember where he spent the last month or according to his own testimony, I can't remember what I had for breakfast. He's not a credible rebuttal witness, and that's why I asked the court to allow me to testify as a rebuttal witness. Because we're talking about surveillance of him in a boat, and again, we're talking about this editing. Well, here's the situation because I was in the boat and it was a small boat, and he's in the back. And I'm over the front of it, paddling, trying to dig us out of sludge and mud on the Illinois River, but I'm zooming out. To the point that when we get back on the dock, I'm literally dead, passed out, puffing and puffing, and he gets out of the boat just... Okay, yeah, because he wasn't doing anything to get us back to the dock. I was, but again, I wasn't afforded an opportunity to speak on that. So... Your time has gone beyond again. Thank you. Okay, well, thank you, counsel. Thank you, counsel, for all three arguments in this matter. We will be taking them under advisement, and a written disposition shall issue.